# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRIAN MAURICE WILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-728-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Brian Maurice Wiley ("Wiley"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Wiley's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wiley appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Wiley was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Wiley was 48 years old at the time of the first hearing before the ALJ on November 20, 2007, and 49 at the time of the second hearing on January 5, 2009. (R. 31, 45, 50, 69, 182). Wiley testified that he had worked as a developmental technician in the automotive field for seven years,

and was a chemical prep operator for twelve years, for the same employer. (54-57). There was significant lifting required by both jobs. *Id.* He worked until April 12, 2002, and was then off work doing physical therapy until he returned to work from July 8 to August 12, 2002. (R. 57). He said when he returned and was put back in his regular job, he experienced the same problems that he had before he left in April 2002, and he had not worked since then. *Id.*

Wiley testified that he had a five-pound weight restriction, had carpal tunnel surgery in both hands, and had two bulging disks in his neck between C3 and C7. (R. 58-59). He had a year of college, and at the time of the November 2007 hearing was attending school to be a lab technician. *Id.* At school, he did some sitting, some computer work, some lab work, and he had problems washing glassware because it broke when it slipped out of his hands. (R. 60). As soon as he left school, he returned home and usually took a nap. *Id.* At the January 2009 hearing, Wiley testified that the attempt to go to school for training as a laboratory technician was not successful because he couldn't do the job due to his inability to grasp the glassware and the pain caused by the work. (R. 39-40).

Wiley testified that he experienced a sharp pain in the palm of his hand if he did much work with his hands. *Id.* He said he also had a pain in his shoulder that felt like an ice pick between the left side of his shoulder blade and neck. (R. 36-37, 60). He said that the pain averaged about six to seven on a scale of one to ten, but on occasion it had been a ten. (R. 60-61). He said working with his hands, especially over his head or away from his body would aggravate his pain, which was usually delayed from the time of the activity. (R. 61). Wiley testified that the only way to get relief from the pain in his neck was to lie down. (R. 37).

At the second hearing in 2009, Wiley testified that he was taking a prescription medication,

generic Neurontin, but he did not believe it was helping. *Id.* At that time, Wiley had had a series of three steroid injections in his spine, with 6 or 7 weeks between the injections. (R. 37-38). He testified that after the last injection, he had been experiencing more limited range of motion in his neck than usual, with an inability to turn his head due to the sharp ice-pick pain in his shoulders. (R. 38, 43). He had limited his driving because of this inability to turn his head. (R. 38). He said that any movement of his head, including bending, was painful, and while the pain was worse after the most recent injection, the problem had been ongoing for 5 years. *Id.* He believed that the pain specialist who had done the injections was going to recommend that he see a neurologist, and that perhaps surgery would be the next step. (R. 39). He believed that his condition had worsened from the 2007 to the 2009 hearing, because the pain level was worse and his ability to move his head was more limited. (R. 41). He testified that he spent more time lying down and less time in a sitting or standing position. *Id.*

A physician had previously given him a restriction of no lifting over 5 pounds and no repetitive use of his hands, and Wiley believed those restrictions were still in effect. (R. 39). He said he did not do any activities that were not in accord with those restrictions. *Id.* Wiley testified that he had hired someone to do the yard work, and his wife or stepdaughter did the housework. (R. 41).

At the time of the second hearing, Wiley testified that on a typical day he would get up at 8 or 9 in the morning and watch television for a couple of hours and then return to bed for a few hours. (R. 40). In the afternoon, he would watch television from the couch, because being in a horizontal position was the only way to keep his neck from hurting. *Id.* At night, he would wake up from pain because he would roll over in his sleep into a position that caused pain. (R. 40-41).

Wiley saw Gerald H. Sutton, D.O. on April 23, 2002 with a complaint of a burning sensation in his right lower neck and shoulder region after a fishing trip. (R. 313-14). Dr. Sutton restricted him from working temporarily and referred him for physical therapy and an MRI. *Id.* Dr. Sutton saw him again on June 6, 2002, and referred him to Allan S. Fielding, M.D. (R. 311-12).

In a letter to Dr. Sutton dated June 28, 2002, Dr. Fielding recounted Wiley's history as involving moderate neck stiffness from 1988 to 2002, when Wiley went on a fishing trip and developed a burning sensation in both shoulders when using his arms. (R. 262-65). At the time of the examination, the pain was a constant ache at the base of his neck. (R. 262). There was no sensory loss or weakness. *Id.* Physical examination confirmed that his upper extremity strength and sensory aspects were normal. (R. 264). Range of motion was full and painless. *Id.* Dr. Fielding found only minimal tenderness at the C6 level, and found Wiley to be neurologically normal. *Id.* His review of a cervical MRI scan showed very minimal cervical spondylosis that was consistent with Wiley's 42 years of age. *Id.* Dr. Fielding signed a release for Wiley to return to his previous work activities. (R. 265).

Dr. Sutton saw Wiley on July 12, 2002, found that he was much improved, and released him to return to work to his regular duties. (R. 309). Wiley returned to Dr. Sutton on August 14, 2002 with renewed complaints of pain and restricted motion of his head and upper back region. (R. 307-08). On August 19, 2002, Wiley returned, saying that he had not been able to complete a regular shift at work due to pain. (R. 304-05). On September 6, 2002, Dr. Sutton saw Wiley again, who continued to be off work, and he referred him to a rehabilitation specialist. (R. 301-03).

Wiley was then evaluated by Annie Venugopal, M.D. on September 12, 2002. (R. 266-68). Dr. Venugopal's recounting of Wiley's history stated that he experienced neck pain radiating to his

shoulders and weakness and paresthesias of his upper extremities. (R. 266). A sharp, deep pain was also noted in his upper shoulders and neck, as well as weakness in his arm muscles and left leg. *Id.* Dr. Venugopal's impression was "musculo ligamentous strain," with a note to rule out radiculopathy, and she recommended an electromyogram of his bilateral upper extremities and neck paraspinal muscles. *Id.* Her impression after the EMG study was bilateral carpal tunnel syndrome. (R. 267-68).

Kenneth R. Trinidad, D.O. examined Wiley on November 4, 2002 as part of workers compensation proceedings, but the administrative transcript only contains the first two pages of Dr. Trinidad's report. (R. 326-27). His examination showed positive Phalen's sign bilaterally and decreased sensation in the first three digits of both hands. (R. 327). There was tenderness and spasms in the cervical spine from C4 to C7. *Id.*

Wiley was then evaluated by Perry D. Inhofe, M.D. on June 4, 2003. (R. 296-98). Dr. Inhofe recounted the history of Wiley's symptoms and their worsening over time. Even after Wiley quit work in August 2002, he continued to have soreness in both upper extremities and numbness and tingling in both hands. (R. 297). At the time of Dr. Inhofe's examination, Wiley reported that he had these symptoms during the day and the night and was sometimes awakened by them. *Id.* On examination, Wiley had subjective tenderness and diminished sensation, with bilaterally positive Tinel's sign. *Id.* Dr. Inhofe's opinion was that Wiley had bilateral carpal tunnel syndrome and that it was a direct result of his work. *Id.* Dr. Inhofe's opinion was that Wiley had restrictions backdated to April 25, 2002 of no lifting more than 10 pounds and no repetitive use of the hands. (R. 298).

Records from Saint Francis Hospital reflect that Wiley had carpal tunnel release surgeries by Dr. Inhofe on November 18, 2003 and January 13, 2004. (R. 270-79). At a March 8, 2004 post-

operative appointment, Dr. Inhofe believed that Wiley was healing well, and he completed a form reflecting that Wiley had a right-sided restriction of no lifting or carrying over 5 pounds. (R. 287-89). Dr. Inhofe saw Wiley again on April 12, 2004, and expressed the opinion that Wiley would not be able to return to his previous work. (R. 283). At this time, Dr. Inhofe completed the work restrictions form indicating a 5-pound lifting and carrying restriction for both sides. (R. 284). Dr. Inhofe saw Wiley on June 17, 2004, and gave an opinion in narrative form that Wiley had reached maximum medical improvement and had permanent restrictions of no lifting more than 5 pounds with either hand and no repetitive use of the hands. (R. 280). Dr. Inhofe again completed the form at this time, checking the boxes for both left and right and no lifting or carrying over 5 pounds, indicating that this was a permanent restriction. (R. 282).

Wiley returned to Dr. Sutton on July 19, 2004 with a complaint of left shoulder pain with no radicular symptoms. (R. 299). Dr. Sutton assessed Wiley with bursitis and said that if exercise, ice, and ibuprofen was not effective, that he would refer him for steroid injections. *Id.*

Dr. Trinidad again examined Wiley on July 26, 2004 as part of the workers compensation proceedings. (R. 321-25). Wiley's complaints were constant stiffness and spasm in his neck and upper back, with parethesias into the left arm. (R. 322). He had weakness and parethesias in both hands that were aggravated by activity. *Id.* Physical examination showed positive Tinel's sign and decreased sensation in the first three digits of both hands. *Id.* There was tenderness and spasms of C4 through C7 and T1 through T3 on the left. *Id.* Dr. Trinidad's opinion was that Wiley's impairments were work-related and were stable and chronic, and he gave opinions as to the percentage of impairments for workers compensation purposes. (R. 323-35).

Wiley saw Linda M. Blunt, M.D. on June 20, 2005. (R. 351-53). Wiley's chief complaint

6

was pain of the neck and left shoulder. (R. 351). Dr. Blunt found physical examination to be "unrevealing" and she requested a repeat MRI. (R. 353). Her review of the June 23, 2005 MRI results showed some disc herniations and some foraminal encroachments in the cervical spine, and she said that there was "worsening" since the 2002 MRI. *Id.* She recommended a referral to neurosurgery for treatment options. *Id.*

The administrative transcript contains a letter from Benjamin G. Benner, M.D. of Neurosurgery Specialists dated July 12, 2005, indicating that he saw Wiley at the referral of Dr. Blunt. (R. 330-31). On physical examination, Dr. Benner found some restrictions on neck motion and positive foraminal compression signs on the left. (R. 330). Dr. Benner also found "some weakness of supraspinatus which could be related either to a rotator cuff problem or a C6 nerve root problem." (R. 330-31). Dr. Benner's review of the x-rays showed an area in the canal on the left side at the C5/C6 level that "could compress the C6 root and produce the pattern of pain that he has now." (R. 331). He prescribed Neurontin and thiamine, and said that if Wiley did not improve, he would suggest a steroid injection. *Id.*

Wiley asked for a second opinion and saw John Main, D.O. at the referral of Dr. Blunt. (R. 365-72). Dr. Blunt saw Wiley on January 4, 2006, and his opinion was that Wiley's symptoms did not correlate with the impingement of the C6 nerve root that was shown in the MRI and CT imaging. (R. 367). Instead, his pain correlated to a C5 radicular pain. *Id.* He referred Wiley for physical therapy and cervical traction. *Id.* On July 19, 2006, Dr. Main wrote Dr. Blunt to report that Wiley had minimal relief with these therapies, and he prescribed Lyrica. (R. 398). On September 22, 2006, Dr. Main wrote a letter to Dr. Blunt stating that Wiley's radicular symptoms had improved on Lyrica, and Dr. Blunt did not recommend surgery. (R. 397).

7

Wiley saw Dr. Blunt again on August 24, 2007 with neck pain that was severe and had recently worsened. (R. 386). Her physical examination showed pain and some decrease in range of motion. (R. 387). She referred Wiley to return to Dr. Main. *Id.*

Wiley saw Dr. Main on September 12, 2007 with tingling in his lower extremities. (R. 396). Wiley had been taking Lyrica intermittently but was unable to afford it at the time of the examination. *Id.* He also complained that it made him drowsy and he had "a difficulty with his motorcycle." *Id.* Dr. Main recommended a change to Neurontin. *Id.*

Wiley saw Dr. Blunt again on June 19, 2008 with neck pain and stated that the Neurontin was not adequate to control his pain with almost any activity. (R. 407-08). On September 29, 2008, Wiley reported that the Neurontin was helping, but that he was not sure that the relief was adequate. (R. 406-07). He reported some depression, but said that it was resolved with activity. *Id.*

Wiley was evaluated by Andrew F. Revelis, M.D. at Tulsa Pain Consultants on August 7, 2008. (R. 413). Dr. Revelis stated that the diagnostic imaging was consistent with multilevel cervical degenerative changes with stenosis. *Id.* His physical examination showed full range of motion and strength. (R. 414). His impressions were cervical degenerative disk disease and upper extremity radiculopathy. *Id.* On September 9, 2008, Wiley underwent a C7/T1 "translaminar cervical epidural injection" with Dr. Revelis (R. 412). The impressions were cervical disk displacement without myelopathy and upper extremity radiculopathy. *Id.* Identical procedures were performed by Dr. Revelis on October 21, 2008 and December 23, 2008. (R. 421-24).

Wiley apparently saw a new physician, Kevin Ree, D.O. on January 14, 2009 and reported that the steroid injections by Dr. Revelis were not working. (R. 429). Physical examination showed decreased rotation of Wiley's neck to the right, and occasional weakness in his right shoulder. (R.

429-30). Dr. Ree prescribed Gabapentin (generic for Neurontin), Motrin, and Flexeril. (R. 430).

Wiley was seen for an examination by agency consultant Beau C. Jennings, D.O. on April 18, 2006. (R. 332-41). On examination, Dr. Jennings noted "diminished pinch strength bilaterally." (R. 333). He rated Wiley's grip as 3+/4 bilaterally. *Id.* He found no diminished range of motion in Wiley's upper extremities. *Id.* His assessment was chronic bilateral carpal tunnel syndrome, and chronic neck pain presumably related to herniated intervertebral disk. *Id.* Dr. Jennings did not complete the measurements on the hand/wrist sheet, but did answer yes to the questions as to whether Wiley could effectively oppose his thumb to his finger tips, manipulate small objects, and effectively grasp tools such as a hammer. (R. 336). On the backsheet, for the lumbosacral spine, Dr. Jennings did not fill out the spaces for range of motion, but noted that walking, straight leg raising, and strength were normal. (R. 337). He did not fill out the portion of the sheet for the cervical spine. *Id.*

A Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Ernestine Shires, M.D. on May 9, 2006. (R. 342-49). Dr. Shires found that Wiley could lift less than 10 pounds, and could stand, walk, or sit about 6 hours in an 8-hour day. (R. 343). For the portion of the form calling for explanation, Dr. Shires reviewed Wiley's history of carpal tunnel surgery and summarized Dr. Jennings' examination findings. (R. 343-44). Dr. Shires also reviewed the permanent restrictions given by Dr. Inhofe, and the evidence of the x-rays and MRI that showed spondylosis and multi-level encroachment. *Id.* For postural limitations, Dr. Shires found that Wiley could never climb or crawl, but could frequently balance, stoop, kneel, or crouch. (R. 344). For manipulative limitations, Dr. Shires indicated that Wiley's handling was limited, and she did not check any boxes for reaching, fingering, and feeling. (R. 345). For

9

explanation, she said that the medical evidence of record showed diminished grip strength that would likely be worse on a sustained basis. *Id.* She found no visual or communication limitations. (R. 345-46). For environmental limitations, she checked a box stating that Wiley should avoid even moderate exposure to vibration, and in her narrative explanation cited to Wiley's evidence of symptoms from C6 compression and chronic carpal tunnel syndrome. (R. 346). She stated that the other environmental limitations were unlimited. *Id.*

On December 27, 2006, nonexamining agency consultant Carmen Bird, M.D. wrote on a Case Analysis form, as follows: "I don't like the handling restriction that are [sic] in the original RFC. Could we do a new RFC with no handling restrictions?" (R. 373). Dr. Bird then completed a Physical Residual Functional Capacity Assessment dated January 5, 2007. (R. 374-81). Dr. Bird found that Wiley could left less than 10 pounds frequently, but could lift 10 pounds occasionally. (R. 375). He could stand, walk, or sit for 6 hours in an 8-hour day. *Id.* In the narrative explanation, Dr. Bird cited to Wiley's status post-carpal tunnel syndrome surgery, and to Dr. Jennings' findings that Wiley had diminished pinch strength and that his grip strength was 3+/4 bilaterally. *Id.* She said that his hand functions were normal, and he had full range of motion. *Id.* Dr. Bird found no manipulative limitations, no visual limitations, and no communicative limitations. (R. 376-77). She stated that Wiley should avoid even moderate exposure to vibration due to his carpal tunnel syndrome surgery, but found no other environmental limitations. (R. 377). She stated that there was a medical source statement in the file, and that it did not differ significantly from her findings. (R. 380). In explanation, she said that the medical source statement dated January 17, 2004[1] gave

---

[1]Although the date is incorrectly stated, presumably Dr. Bird was referring to the opinion Dr. Inhofe gave on June 17, 2004, that Wiley had permanent restrictions of no lifting more than 5 pounds with either hand and no repetitive use of the hands. (R. 280-82).

a permanent lifting restriction of 5 pounds, and that it was supported by the medical evidence of record. *Id.*

**Procedural History**

On December 8, 2005, Wiley filed an application seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*, alleging disability beginning April 12, 2002. (R. 182-88). The application was denied initially and on reconsideration. (R. 92-95, 101-03). A hearing before ALJ Deborah L. Rose was held November 20, 2007 in Tulsa, Oklahoma. (R. 50-74). By decision dated May 21, 2008, the ALJ found that Wiley was not disabled at any time through the date of the decision. (R. 77-86). On July 30, 2008, the Appeals Council remanded for the ALJ to give weight to the opinion evidence of Dr. Inhofe and to discuss the opinion evidence of Dr. Trinidad. (R. 88-89). A second hearing was held before the ALJ on January 5, 2009. (R. 31-49). On September 16, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §

404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Wiley met insured status requirements through March 31, 2010. (R. 19). At Step One, the ALJ found that Wiley had not engaged in any substantial gainful activity since his alleged onset date of April 12, 2002. *Id.* At Step Two, the ALJ found that Wiley had severe impairments of degenerative disc disease of the cervical spine and mild stenosis; bilateral carpal tunnel syndrome; and status post surgical release. *Id.* At Step Three, the ALJ found that Wiley's impairments did not meet a Listing. (R. 19-20).

The ALJ determined that Wiley had the RFC to do the full range of sedentary work "except that he has limited use of his non-dominant left upper extremity such that he cannot operate hand controls with that hand. The claimant can only occasionally do work involving hand vibration and cannot climb or crawl." (R. 20). At Step Four, the ALJ found that Wiley could not perform any past relevant work. (R. 23). At Step Five, the ALJ found that there were jobs that Wiley could perform, taking into account his age, education, work experience, and RFC. (R. 24). Therefore, the ALJ found that Wiley was not disabled at any time from the onset date of April 12, 2002 through the date of her decision. (R. 25).

**Review**

While Wiley raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Wiley's treating physician, Dr. Inhofe, and because it mischaracterized some of the other opinion evidence. Because reversal is required based on these issues, the other issues Wiley raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more

weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

The ALJ's discussion of Dr. Inhofe's evidence is not sufficient, and her reasons for discounting the opinions of Dr. Inhofe are not legitimate ones. The ALJ stated that Dr. Inhofe's opinion was that Wiley should lift no more than 10 pounds with either hand and should not use his hands repetitively. (R. 23). After noting that Dr. Inhofe later reduced the weight that Wiley could lift to 5 pounds, she appeared to criticize this opinion because Wiley "acknowledged to [Dr. Inhofe] that he was continuing to improve." *Id.* If the ALJ intended Wiley's continuing improvement to be one reason why she discounted Dr. Inhofe's opinion, this fails because Dr. Inhofe himself addressed the issue of Wiley's improvement at the time he gave the opinion. The last time that Dr. Inhofe saw Wiley, he noted that the improvement was becoming less and was approaching a "steady state level."

14

(R. 280). Dr. Inhofe then gave his professional opinion that Wiley had reached maximum medical improvement, and based on that he gave permanent restrictions of no lifting over 5 pounds with either hand and no repetitive use of the hands. *Id.* Therefore, because Dr. Inhofe explained the nature of Wiley's improvement and nevertheless gave his professional opinion as to Wiley's permanent restrictions, the ALJ's implied criticism does not justify any discounting or rejection of Dr. Inhofe's opinion evidence.

The ALJ then stated that she gave little weight to Dr. Inhofe's opinion that Wiley was precluded from repetitive use of his hands "in that the term repetitive has no clear meaning." (R. 23). From a review of case law, it appears that the ALJ is the first adjudicator to reject the term "repetitive" in a medical opinion, and the undersigned disagrees with the ALJ's reasoning that the term "repetitive" has no meaning and finds that this is not a legitimate reason to discount a treating physician opinion. The vocational expert's testimony, as is so often the case, was rather telegraphic in that not much detail was given, but he testified at the 2009 hearing that "repetitive" could be "frequent" or it could be "constant," with the implication that he was explaining the meaning of that term in vocational usage. (R. 45-46). The ALJ then went on to ask two hypotheticals - one based on the claimant being able to use his hands frequently, but not constantly, and one based on the ability to only use his hands occasionally. *Id.* The Tenth Circuit approved of similar testimony by a vocational expert in *Stokes v. Astrue*, 274 Fed. Appx. 675, 686-87 (10th Cir. 2008) (unpublished). *See also* Social Security Ruling 96-9p, 1996 WL 374185 ("Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."). The term "repetitive" does, therefore, have meaning in the context of Social Security disability proceedings, and the fact that the treating physician's opinion was stated in terms of "no repetitive use of the hands" was not a

15

legitimate basis for discounting or rejecting that opinion.

The ALJ then went on to state that she had acknowledged Wiley's limitations in the RFC determination by including a limitation that Wiley could not use hand controls with his left arm and could only occasionally perform work involving vibration. (R. 23). These limitations, of course, are not consistent with the much more specific and restrictive limitations given by Dr. Inhofe. Finally, the ALJ stated that she found "no objective reason" for the 5-pound weight restriction. *Id.* The lack of objective evidence supporting a treating physician opinion is a legitimate basis for rejecting or discounting the opinion. *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001). In Wiley's case, Dr. Inhofe had the objective medical evidence of having performed two surgeries for carpal tunnel release on which to base his opinion. His treatment of Wiley through the surgery and recovery gave him an objective basis for a professional opinion that a patient, such as Wiley, having had this kind of surgery, should limit the use of his hands. This is in contrast to those cases in which a physician relies solely on subjective complaints in giving his professional opinion about a claimant's restrictions. Therefore, the Court finds that the ALJ's rejection of Dr. Wiley's opinion as not being based on objective evidence is not supported by substantial evidence.

Moreover, the Court is concerned about the next portion of the ALJ's opinion in which she says that she gave "great weight" to the opinions of the nonexamining agency consultants because "they are well supported by the objective medical findings reported above and they are uncontradicted by any substantial evidence of record." (R. 23). "Uncontradicted," is an incorrect characterization of the opinions of Dr. Shires and Dr. Bird. First, Dr. Shires found that Wiley could lift less than 10 pounds, Dr. Bird found that Wiley could lift 10 pounds only occasionally, and the ALJ found that Wiley could lift 10 pounds frequently. (R. 20-23, 343, 375). Thus, as to Wiley's

16

ability to lift, the opinions of Dr. Shires and Dr. Bird contradicted each other, and they both contradicted the RFC determination of the ALJ.

Second, Dr. Shires found that Wiley had a handling restriction and in her comments implied that this would be worse "on a sustained basis." (R. 345). In contrast, Dr. Bird found no handling restrictions, and the ALJ included a restriction on using hand controls with his left hand. (R. 20-23, 376). Thus, as to Wiley's handling ability, the two nonexamining opinions contradict each other and the RFC determination of the ALJ. The ALJ cannot make opinion evidence uncontradicted merely by stating that it is so, and the Court finds this misstatement of the evidence to be troubling. Because the ALJ said that she gave "great weight" to the opinions of the nonexamining consultants in part because they were "uncontradicted by any substantial evidence," and they actually contradict each other, the opinion of the ALJ, and the treating physician opinion of Dr. Inhofe, this undermines whether there was substantial evidence to support the ALJ's RFC determination.

The Commissioner makes the argument that any error by the ALJ is harmless error because the vocational expert testified that there were two jobs that Wiley could perform even with the limitations based on the opinion evidence of Dr. Inhofe. Commissioner's Brief, Dkt. #18, p. 6. The Commissioner cites *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) in support of this position, stating that under *Sanders* the burden is on the claimant to show that an error is harmful. The undersigned has previously explained in detail his reluctance to apply *Sanders* in the Social Security disability context. *Clark v. Astrue*, 2010 WL 3909883 (N.D. Okla.). Instead, the undersigned finds that the standard for harmless error in the context of Social Security disability appeals continues to be the one set out by the Tenth Circuit in *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005).

In *Fischer-Ross*, the ALJ had failed to include any facts or analysis in Step Three, but the

district court held that this was reversible error because the court could not adequately review the bare conclusion. The district court went on, however, to uphold the ALJ's determination at Steps Four and Five that the claimant's RFC allowed her to perform a significant number of occupations. *Id.* at 732. The Tenth Circuit found that the ALJ's specific findings at those steps contradicted a conclusion that the claimant's problems could meet the severity required to be conclusively presumed disabled under any of the pertinent listings. *Id.* at 734-35. The Tenth Circuit's summation gave a concise explanation of the concept of harmless error:

> In sum, the ALJ's confirmed finding at steps four and five of his analysis, coupled with indisputable aspects of the medical record, conclusively preclude Claimant's qualification under the listings at step three. No reasonable factfinder could conclude otherwise. Thus, any deficiency in the ALJ's articulation of his reasoning to support his step three determination is harmless.

*Id.* at 735.

In the present case, the undersigned believes that the scope of the ALJ's error regarding her treatment of the opinion evidence is such that doctrine of harmless error as articulated in *Fischer-Ross* does not apply. The Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Henderson v. Astrue*, 383 Fed. Appx. 700, 702 ( Cir. 2010) (unreported) (further citation omitted).

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Wiley. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Wiley.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to

18

assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 23rd day of February, 2011.

_____
Paul J. Cleary
United States Magistrate Judge